361 So.2d 898 (1978)
Anna May Posey VETTER et al., Plaintiffs-Appellees,
v.
T. C. MORROW, d/b/a T. C. Morrow Oil Company, Defendant-Appellant.
No. 13572.
Court of Appeal of Louisiana, Second Circuit.
June 5, 1978.
Rehearing Denied August 15, 1978.
*899 Hargrove, Guyton, Ramey & Barlow by Thomas J. Wyatt, David L. Smelley, Shreveport, for defendant-appellant.
John S. Stephens, Coushatta, for plaintiffs-appellees.
Before BOLIN, PRICE and MARVIN, JJ.
En Banc. Rehearing Denied August 15, 1978.
PRICE, Judge.
T. C. Morrow, d/b/a T. C. Morrow Oil Company, has appealed the judgment ordering a partial cancellation of an oil, gas, and mineral lease and awarding attorney fees to lessors.
The principal issue is whether the lessee acted as a reasonably prudent operator in developing the leased premises.
George J. Posey and his three children, Anna May Posey Vetter, Edwina Posey Glover, and Stephen John Posey, granted a mineral lease to defendant on July 16, 1965, covering 385 acres in Sections 8, 17, and 18, T 12 N, R 10 W, of Red River Parish for a primary term of ten years. No drilling has taken place on any of the leased acreage during the primary term of the lease. The lease has been continued in effect since 1974 by the inclusion of a portion of the leased acreage in Sections 8 and 17 in drilling and production units established by the Commissioner of Conservation for the Gahagan Field from which gas has been produced in paying quantities from the Hosston Formation, Reservoir A.
Plaintiffs, who succeeded to the rights of George Posey by inheritance, brought this suit in August 1977 contending that defendant had failed and refused to properly develop the acreage lying in Section 18, which constitutes a substantial portion of total acreage leased, and that written notice had been given defendant on May 31, 1977, to begin operations within sixty days or to release that portion of the lease not included in the producing units. Plaintiffs contend defendant has not complied with their demand and request this portion of the lease should be ordered cancelled.
The trial court found that defendant had not developed the leased acreage in Section 18 in the Hosston zone as a reasonably prudent operator and ordered the lease cancelled as to this part of the leased premises. Plaintiffs were also awarded the sum of $2,500 for attorney fees under the provisions of La. R.S. 31:209.
The assignments of error of defendant present two issues on this appeal: (1) did plaintiffs offer sufficient proof to show defendant failed to act as a prudent operator in not having drilled a well to the Hosston Formation on the portion of the leased lands lying in Section 18; (2) did plaintiffs' evidence support an award of attorney fees.
A mineral lessee is under a duty to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. La.R.S. 31:122. This article of the Louisiana Mineral Code adopted in 1974 does not change the rules previously declared by the Supreme Court in Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948), as follows:
The law of this state is well settled that the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract; further, that as to what constitutes development and reasonable diligence on the part of the lessee must conform to, and be governed by, what is expected of persons of ordinary prudence under similar circumstances and conditions, having due regard for the interest of both contracting parties. [cites omitted]
To fulfill his duty under the law a lessee has the obligation to develop known *900 mineral producing formations in the manner of a reasonable, prudent operator and to explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonable, prudent operator. See comments under La.R.S. 31:122; LeJeune v. Superior Oil Co., 315 So.2d 415 (La.App.3rd Cir. 1975); Carter v. Arkansas Louisiana Gas Co., supra.
In the instant case the discovery well in the Hosston Formation of the Gahagan Field, the Hoss RA Sand Unit B (referred to as the Huckaby Well) was drilled by third parties in Section 16 in 1972. The Commissioner of Conservation established a drilling and production unit coextensive with the governmental section (640 acres), and this pattern has been generally followed by the commissioner in subsequent wells drilled to the same formation in this field. In August 1974, the Rush Well in Sand Unit C was completed by third parties on land in Section 17. Eighty acres of the subject lease is situated in this section and was unitized by the commissioner into Sand Unit C. In August 1976, the Sally Hook Well was completed by third parties in Sand Unit J in Section 8 which lies directly north of Section 17. An additional thirty acres of plaintiffs' leased lands are situated in this section and were unitized into this producing unit.
The remaining 250 acres of the leased land which plaintiffs seek to have released are situated in Section 18 which is directly west of Section 17.
Plaintiffs contend the substantial production obtained in the wells drilled in the adjacent sections to the east of Section 18 and the evidence submitted showing that the probable trend of producing sands is to the west toward Section 18, created a duty on defendant to develop the portion of the lease in this section without further delay.
Defendant contends he was justified in waiting for the results of a proposed well in Section 7 to the north before commencing drilling activity to the Hosston Formation in Section 18. In support of this position defendant offered the testimony of an expert witness, Roy Lee Rogers, Jr., a geologist, who testified generally that a prudent operator would drill Section 7 prior to Section 18. Rogers admitted however there were no significant geological reasons for this conclusion. His opinion was premised on the fact that defendant controlled more acreage in Section 7 and could begin drilling sooner and at a lesser cost to himself in this section than in Section 18. As plaintiffs own no lands in Section 7, these considerations exclusively inure to the benefit of the defendant and are not of mutual benefit to both parties as required by law.
Rogers also testified Section 7 was preferred since a well should be drilled near an already producing well to improve the chance of obtaining production. From the maps of the Gahagan Field filed in evidence, it appears that a well could be drilled in Section 18 substantially as close to the existing Rush Well in Section 17 as the proposed site in Section 7 is to the Hook Well.
In deciding whether development has been reasonable for the benefit of both lessor and lessee, the jurisprudence has usually considered the following factors: (1) geological data; (2) number and location of the wells drilled both on leased lands and adjoining property; (3) productive capacity of producing wells; (4) costs of drilling operations as compared with profits; (5) time interval between completion of the last well and the demand for additional operations; and (6) acreage involved in the disputed lease. (See Tulane Law Review, Vol. XXVII 353, at pp. 357-358.)
The relevant geological data reveals that the paying quantities production in the Hosston Formation lies in a westward direction from the initial discovery well, the Huckaby Well, located in Sand Unit B, which is the third best producer in the formation. Due west of the Huckaby Well is the Rush Well in Sand Unit C which is the second best producer, and to the northwest is the Hooks Well, which at the time of trial was the most prolific producer in the Hosston Formation. Plaintiffs' property in Section 18 is directly west of the Rush *901 Well and contiguous with Sand Unit C. Test wells drilled by other operators to the north, south, and east of the discovery well proved to be either unproductive or of marginal capacity.
The other pertinent factors to be considered reveal that eight wells were drilled altogether in the Gahagan Field in the Hosston Formation, Reservoir A, none of which was drilled on land leased by plaintiffs. The production obtained thus far in the western direction toward Section 18 has been very profitable when compared to the costs of drilling and maintaining the wells. The cost to drill a complete well to the Hosston Formation and have it ready for production ranges from $250,000 to $275,000, and the monthly expenses are approximately $500 per month. The Rush Well, for example, at the time of trial was continuing to generate approximately $47,000 per month after the deduction of operating costs. It now produces approximately a million cubic feet of gas per day at a market price of $1.40 per MCF. The Huckaby Well continues to produce a half million cubic feet per day, and the Hook Well produces one and a quarter million cubic feet per day.
Although the time interval between demand on defendant (May 31, 1977) and the last completed well in the Hosston Formation was not excessive, this factor is not in itself controlling since defendant has made no substantial expenditure on the lease property which would justify a delay in commencing additional development. Further, 250 of the 385 acres leased by plaintiffs to defendant lie in the non-unitized, undeveloped Section 18.
The aggregation of these factors when weighed together are sufficient to sustain the trial judge's finding that prudent development has not been performed by defendant, and that the lease should be annulled on the non-unitized lands in Section 18.
The second issue is whether the trial court's award of $2,500 attorney fees was proper. Defendant contends that as no evidence was adduced at trial showing the value of legal services, an award cannot be granted. The trial court has the authority to fix reasonable attorney fees in the absence of expert testimony where the services rendered are under the eye of the court. Caldwell v. Trans-Gulf Petroleum Corporation, 311 So.2d 80 (La.App.2d Cir. 1975). Without the aid of expert testimony, attorney fees should be commensurate with value of services rendered in the various proceedings reflected in the record and the complexity and nature of the case. The amount awarded by the trial court is within the discretion accorded it in such matters and should be affirmed.
For the reasons assigned, the judgment is affirmed at appellant's costs.